UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EDMUND G. SANDERSON,

                Plaintiff,

    -v-                                              8:16-CV-644

FIRST LIBERTY INSURANCE
CORPORATION,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

EDMUND G. SANDERSON
Plaintiff, Pro Se
7581 State Route 9
P.O. Box 2660
Plattsburgh, NY 12901

GOLDBERG, SEGALLA LAW FIRM          JONATHAN SCHAPP, ESQ.
Attorneys for Defendant
665 Main Street, Suite 400
Buffalo, NY 14202

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

    This is an insurance dispute between pro se plaintiff Edmund G. Sanderson ("Sanderson" or "plaintiff") and defendant First Liberty Insurance Corporation ("First Liberty" or "defendant"), his homeowner's insurance carrier, over precisely how much it should pay out for a covered loss.

The trouble started back in January of 2014, when Sanderson discovered some water and mold damage from a burst water pipe in the bathroom ceiling of his home. Plaintiff timely sought coverage from First Liberty, which set about the process of settling plaintiff's loss claim. Unfortunately, over the course of the ensuing two years, plaintiff came to believe that defendant's claim representative was trying to shortchange him.

On January 6, 2016, Sanderson attempted to file suit in state court. Although he managed to purchase an index number, plaintiff did not serve First Liberty until several months later, shortly after he filed an Amended Summons with the state court. This time, plaintiff served defendant through the New York State Department of Financial Services.

On June 6, 2016, First Liberty removed the action to this Court and moved to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(4) and (6). According to defendant's pre-answer dismissal motion, Sanderson failed to effect proper service of his complaint before the relevant statute of limitations ran out. Plaintiff opposed and cross-moved for leave to amend his pleading so that it would relate back to his original state court filing.

On April 19, 2017, a Memorandum–Decision & Order issued denying First Liberty's motion to dismiss. *Sanderson v. First Liberty Ins. Corp.*, 2017 WL 1403274, at *3 (N.D.N.Y. Apr. 19, 2017) ("*Sanderson I*"). There, the Court determined that "Sanderson, without the benefit of counsel, diligently attempted to properly commence this lawsuit in state court against First Liberty, [which] received notice of his suit within an acceptable time period in that forum before removing it to this federal court." *Id*. Accordingly, *Sanderson I* concluded that plaintiff's "lawsuit should be heard on the merits, whatever they may be." *Id*. at *4.

On May 9, 2017, with the service issue settled, First Liberty moved for partial dismissal of Sanderson's complaint. Although defendant's motion acknowledged the viability of

plaintiff's breach of contract claim, it sought to eliminate from the suit plaintiff's various extra-contractual theories of relief as well as his requests for special damages.

Sanderson responded to this development by filing an amended complaint and, three days later, following it up with a single-paragraph opposition memorandum in which he requested that First Liberty's dismissal motion be denied as moot in light of his amended pleading. In reply, defendant requested that the Court considered the merits of its partial dismissal motion in light of the allegations in plaintiff's amended complaint.

On November 7, 2017, another Memorandum–Decision & Order issued granting First Liberty's motion for partial dismissal. *Sanderson v. First Liberty Ins. Corp.*, 2017 WL 5176371 (N.D.N.Y. Nov. 7, 2017) ("*Sanderson II*"), *appeal dismissed*, 2018 WL 6428070 (2d Cir. Apr. 24, 2018). There, the Court determined that most of plaintiff's ten causes of action, which included, *inter alia*, a claim for breach of the implied promise of "peace of mind" and various theories of tort liability, were subject to dismissal. *Sanderson II*, 2017 WL 5176371, at *3-*7. However, *Sanderson II* sent the parties to discovery on the relatively narrow issue of whether defendant "breached certain provisions of the homeowner's insurance policy it issued to [plaintiff]." *Id*. at *7.

Thereafter, U.S. Magistrate Judge Christian F. Hummel assumed responsibility for ushering the parties through the discovery process. It turned out to be a difficult assignment—the parties have battled it out over disputes large and small, repeatedly necessitating Judge Hummel's intervention. *See, e.g.*, Dkt. Nos. 51, 54, 59, 61, 69, 77, 82, 84, 99, 103, 114. And on the occasions when plaintiff has come away from those meetings dissatisfied, he has not hesitated to bring challenges Judge Hummel's discovery rulings in front of this Court. *See* Dkt. Nos. 93, 119. The docket report in this action also reveals that

Judge Hummel tried, on at least two different occasions, to assist the parties in reaching a mutually agreeable settlement. In short, Judge Hummel did yeoman's work in bringing the discovery period in this action to a close.

On February 4, 2019, after those efforts failed, First Liberty moved under Federal Rule of Civil Procedure ("Rule") 56 for partial summary judgment. As defendant explains in its filings, Sanderson's breach of contract claim seeks three categories of damages: (1) a building claim; (2) a personal property claim; and (3) a "code upgrade" claim. According to defendant, the plain language of the parties' contract carves out an exception for reimbursement for the particular "code upgrades" sought by plaintiff.

On February 6, 19, and 22, Sanderson received a trilogy of extensions of time to respond to First Liberty's motion for partial summary judgment. Dkt. Nos. 130, 133, 135. Thereafter, plaintiff filed two different motions of his own. In the first filing, plaintiff argues that First Liberty's motion is "moot," but then requests a determination that his homeowner's policy "provides coverage for the increased cost of dwelling repair attributable to repair or replacement of undamaged code noncompliant features required by ordinance or law to be upgraded prior to the repair of the damage caused by the peril insured against." In the second filing, plaintiff seeks dismissal of certain affirmative defenses and various money judgments in his favor.

The motions have been fully briefed and will be decided on the basis of the submissions without oral argument.

## II.  **BACKGROUND**

The few relevant facts are taken from a comparison of First Liberty's Local Rule 7.1(a)(3) Statement and Sanderson's response to same. *Compare* Dkt. No. 127, *with* Dkt.

No. 136-4. A full history of the case is available in *Sanderson I* and *II* and will not be repeated here.

On January 25, 2013, First Liberty issued to Sanderson homeowner's insurance policy number H36-228-085080-70. Ex. F to Schapp Decl., Dkt. No. 124-6 (the "Policy").

Among other things, the Policy contains an "ordinance or law" exclusion:

> 1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
>    a. Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

Policy at 13.[1]

Relatedly, the Policy contains several forms of additional coverage, including some limited coverage for the type of costs that would otherwise be excluded by the "Ordinance or Law" Exclusion set forth above. As relevant here, one endorsement provides that:

> 11. Ordinance or Law
>
>     a. You may use up to 10% of the limit of liability that applies to Coverage A . . . for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:
>
>        (1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;
>
>        (2) The demolition and reconstruction of the undamaged part of a covered building or other

---

[1] Pagination corresponds to CM/ECF.

- 5 -

>>> structure, when that building or other structure must be totally demolished because of damaged by a Peril Insured Against to another part of that covered building or other structure; or
>>>
>>> (3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.
>>
>> b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in a. above.
>>
>> c. We do not cover:
>>
>>> (1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or
>>>
>>> (2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants on any covered building or other structure.

Policy at 31.

First Liberty argues that the Ordinance or Law Exclusion (set forth first) precludes recovery for the increased cost of certain "code upgrades" sought by Sanderson while plaintiff argues that recovery for these upgrades is warranted under the additional coverage provided by the Ordinance or Law endorsement (set forth second).

## III. **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). If this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Anderson*, 477 U.S. at 250.

Summary judgment is not appropriate if, after resolving all ambiguities and drawing all factual inferences in favor of the nonmoving party, a review of the record reveals sufficient evidence for a rational trier of fact to find in the non-movant's *favor. Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).[2]

---

[2] Where, as here, the parties have cross-moved for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.) (citation omitted). In undertaking this analysis, a district court is not necessarily required to grant summary judgment in favor of either party. *See, e.g., Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012).

## IV. **DISCUSSION**

In its motion for partial summary judgment, First Liberty contends that the portion of Sanderson's breach of contract claim that seeks recovery for the cost of "code upgrades"; that is, the cost of repairing some non-compliant electrical work that was caught by inspectors during the process of repairing the water damage in his home but not caused by the burst pipe, is excluded from coverage under the Ordinance or Law Exclusion.

Sanderson, for his part, appears to suggest in his opposition memorandum that he is not seeking this kind of relief, but then goes on to argue that the electrical repairs are "necessary" to complete the project and therefore should be covered under Ordinance or Law endorsement mentioned above. *See, e.g.*, Dkt. No. 136-1 at 7.

In support of its argument, First Liberty relies on *St. George Tower v. Ins. Co. of Greater N.Y.*, 139 A.D.3d 200 (N.Y. App. Div. 1st Dep't 2016). There, the need for structural repairs to an apartment building became apparent after the insurer undertook efforts to fix some water damage covered under the policy. *Id.* at 201.

When the insurer refused to foot the bill for the structural repairs required by the municipality's code inspector, the building's owner sued for the extra costs, relying on an "Ordinance or Law" endorsement in the policy. *St. George Tower*, 139 A.D.3d at 201. According to the plaintiff–owner, the insurer should have paid for the structural repairs because bringing the building into compliance with the municipal code was a necessary step in fully completing the water damage remediation process. *Id.*

The Appellate Division rejected that argument. *St. George Tower*, 139 A.D.3d at 206. The court found that the "latent problem" (the structural issue) that was uncovered by

the inspection of the property necessitated by the covered damage (the water issue) "was not a problem related to the covered damage." *Id*.

The Appellate Division reasoned that, if the rule were otherwise, "even an inspector's discovery of code violations resulting from shoddy original construction, such as beams or pipes made of sub-par materials, would leave the insurance company liable for the necessary replacement of those materials any time the problem happened to be uncovered in the course of damage remediation." *St. George Tower*, 139 A.D.3d at 206.

First Liberty contends that Sanderson's "code upgrade" claim is seeking compensation for precisely the same kind of latent-but-wholly-unrelated issue that the plaintiff–owner sought coverage for in *St. George Tower*. In support of this claim, defendant has submitted an excerpted portion of Sanderson's deposition testimony in which he testified that:

> Q. We talked a little bit of the ordinance of law coverage, could you explain what your claim is with respect to that coverage?
>
> A. My claim is that during mold remediation Sheetrock was removed from the walls and parts of the ceiling and that that exposed what I believe is called noncompliant features which are components of building construction which were not installed - - were not to code at the time of installation or construction.
>
> Q. Were not you said?
>
> A. Correct. They were not to code at the time that they were either constructed or installed and that things that were not to code at the time of the construction or installation are not grandfathered and that when they are revealed they must be upgraded before I can - - in my particular case - - put the Sheetrock back on the walls and ceilings to complete the repairs to the damaged portions of building.
>
> . . . .

> Q. And none of those items that you described were actually damaged as a result of this event, correct?
>
> A. For the most part that is correct. There may be some slight - - well, for example, there are - - there were aspects of the building claims that covered - - actually repaired some things that were also code violations because there was some damage to them . . . .
>
> Q. But I'm asking about that 19,000 and change number, that only represented items that were not damaged, correct?
>
> A. Correct.

Ex. D to Schapp Decl., Dkt. No. 124-4.

First Liberty argues that this testimony by Sanderson confirms that this case is just like *St. George Tower*. In both cases, the insurer stepped in to pay for covered water damage when the cleanup revealed that certain features of the structure were non-compliant and would need to be fixed before the municipality's inspector would sign off on the work. And in both cases, the building's owner sued the insurer for the out-of-pocket costs of the unexpected code upgrades being forced on them.

In opposition, Sanderson points out that the insurance policy at issue in *St. George Tower* is a commercial policy with "ordinance or law" language that is substantially different than the Ordinance or Law Exclusion found in the Policy at issue in this case. Plaintiff also argues that the structural issue discovered in *St. George Tower* is unlike the code upgrades he seeks in this case because repairing the noncompliant features in plaintiff's walls and ceilings are "necessary" in order to "repair the damage caused by the peril insured against."

Sanderson thus argues that his case is less like *St. George Tower* and more like *City of Elmira v. Selective Ins. Co. of N.Y.*, 83 A.D.3d 1262 (N.Y. App. Div. 3d Dep't 2011). There, after the southern wall of a historic building collapsed during a windstorm, an

investigation revealed that the hidden deterioration of mortar in the wall weakened the wall to the point of collapse. *Id*. at 1262-63.

When inspectors informed the building's owner that the other walls were similarly weakened and would need to be rebuilt, the plaintiff–owner elected instead to just demolish the building for safety reasons. *City of Elmira*, 83 A.D.3d at 1263. The owner sought reimbursement for the demolition costs under the "ordinance or law" provision of its insurance policy, but the insurer refused. *Id*. According to the insurer, the windstorm (the covered loss) did not cause the enforcement of the local building code that required renovation or demolition. *Id*. at 1264-65.

The Third Department rejected the insurer's argument. *City of Elmira*, 83 A.D.3d at 1265. Importantly, though, the court did so by concluding that the ordinance or law provision contained in the parties' contract did not contain any requirement that the covered cause of loss (*i.e.*, the windstorm itself) be the *direct* cause of the enforcement of a law or ordinance. *Id*. (emphasis added).

Rather, "the only causal link required under [the relevant] provision is that the costs to demolish the undamaged portions of the building be caused by enforcement of an ordinance or law." *City of Elmira*, 83 A.D.3d at 1265. In so holding, the court distinguished the language in the policy at issue from "ordinance or law" endorsements in other policies that "explicitly required that a *covered loss* under the policy *cause* the enforcement of any law or ordinance in effect at the time." *Id*. at n.2 (emphasis in original).

Upon review of the two Policy provisions at issue, it is unmistakably clear that the Ordinance or Law Exclusion in Sanderson's homeowner's policy reaches more broadly than the one in City of Elmira: it explicitly excepts from coverage additional losses "caused

- 11 -

directly or indirectly" from the enforcement of any ordinance or law, and excludes such additional loss "regardless of any other cause or event contributing concurrently or in any sequence to the loss."  Policy at 13.

However, Sanderson argues in favor of coverage by focusing on the limited additional coverage made available in 11(a)(3) of the Ordinance or Law endorsement, which posits coverage for the "replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against."

In Sanderson's view, the shoddy electrical work was revealed once he removed the wet, moldy drywall and other material damaged in the water leak.  Because this electrical work must now be brought up to code before new drywall can be re-installed over it, replacement of an undamaged portion of his house (*i.e.*, the bad electrical work) is "necessary to complete the . . . repair" of the part of his house damaged by the covered loss (*i.e.*, the water damage).

This argument has some facial appeal, but does not stand up to scrutiny.  The principal problem with this line of reasoning is the one identified by the First Department in *St. George Tower*, which is that reading a limited ordinance or law endorsement like 11(a)(3) too broadly would put the insurer on the hook for the cost of replacement every single time a problem "happened to be uncovered in the course of damage remediation," no matter how attenuated the latent problem's relationship is to the covered loss. *St. George Tower*, 139 A.D.3d at 206.

There, as here, the shoddy work that must now be upgraded to meet code is wholly unrelated to the water damage covered by the homeowner's policy.  Indeed, Sanderson's

own testimony makes clear that this work was "not to code at the time of the construction" of his home, and remained so for years before being discovered during the water remediation work. But that is not to say that the 11(a)(3) endorsement is meaningless. Rather, coverage under 11(a)(3) would probably be warranted if, say, a municipal ordinance required some previously code-compliant electrical work to be removed to properly remediate a water damaged area.

Under those circumstances, the limited additional coverage *might* kick in to cover some of the cost of removing and replacing the "undamaged part of the building" (*i.e.*, the original electrical work) that was "necessary to complete the . . . repair" of the structure damaged by the loss (*i.e.*, the water damage). Because that is not the case here, First Liberty's partial motion for summary judgment on this issue will be granted.

This conclusion also necessitates denial of one of Sanderson's cross-motions for summary judgment. *See* Dkt. No. 136-1 (seeking a determination that the Policy provides coverage "for the increased cost of dwelling repair attributable to repair or replacement of undamaged code noncompliant features required by ordinance or law to be upgraded prior to the repair of the damage caused by the peril insured against").

As for Sanderson's other motion for summary judgment, that too will be denied. In that filing, plaintiff argues in conclusory terms that certain of First Liberty's affirmative defenses should be dismissed. Plaintiff also insists the Court should enter money judgments in varying, alternative amounts based on the purported existence of prior, binding agreements between the parties. Upon review of that filing, there is no appropriate basis on which to do so at this time.

## V. CONCLUSION

This is a simple breach of contract action that has gone on for far too long. As the Court recognized all the way back in *Sanderson I*, when it rescued plaintiff from procedural mistakes that might have otherwise proven fatal to his claim, and again in *Sanderson II*, when it pared down his operative pleading and left only the meritorious portion of this lawsuit for discovery, plaintiff is probably entitled to some payment under the Policy for his loss.

In other words, Sanderson has been shown an extraordinary measure of solicitude in light of his status as a *pro se* litigant. Plaintiff has taken full advantage of it for the past three years. But he is rapidly reaching the end of the road. Civil litigation is not like playing the lottery, where the system might spit out a huge payoff to the lucky participant who stays the course. It is about making the plaintiff whole. And where, as here, the dispute is over a contract, the top-end of any monetary recovery is virtually always limited by the terms of the parties' agreement.

The parties should work together to finally settle this case without further judicial intervention.

Therefore, it is

ORDERED that

1. First Liberty's motion for partial summary judgment is GRANTED;

2. Sanderson's motions for partial summary judgment is DENIED.

IT IS SO ORDERED.

Dated: May 7, 2019
      Utica, New York.

                                                United States District Judge